## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SUSAN ISBERNER,

      Plaintiff,

      v.                           Case No. 20-2001-JAR-KGG

WALMART INC.,

      Defendant.

## MEMORANDUM AND ORDER

Plaintiff Susan Isberner brings this action against Defendant Walmart Inc. ("Walmart"), alleging claims of discrimination, hostile work environment, and constructive discharge under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), and the Americans with Disabilities Act ("ADA"). Isberner also brings a Title VII retaliation claim. This matter is now before the Court on Walmart's Motion for Summary Judgment (Doc. 44). The motion is fully briefed, and the Court is prepared to rule. For the reasons set forth in depth below, Walmart's motion is granted in part and denied in part.

## I.     Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a

---

[1] Fed. R. Civ. P. 56(a).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under

the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A dispute

of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact

could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and

entitlement to judgment as a matter of law.[6]  Once the movant has met the initial burden of

showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving

party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving

party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party

must "set forth specific facts that would be admissible in evidence in the event of trial from which

a rational trier of fact could find for the nonmovant."[9]  In setting forth these specific facts, the

nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific

exhibits incorporated therein."[10]  A nonmovant "cannot create a genuine issue of material fact

with unsupported, conclusory allegations."[11]  A genuine issue of material facts must be supported

---

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[8] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[10] *Adler*, 144 F.3d at 671.

[11] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

by "more than a mere scintilla of evidence."[12]  Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]  "At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences."[14]

## II.    Factual Background

### A.    Evidentiary Rulings

Walmart objects to the majority of Isberner's statements of additional facts, often on multiple grounds.  The Court's recitation of material uncontroverted facts incorporates its rulings on Walmart's standard evidentiary objections such as hearsay, relevance, and lack of personal knowledge.  In resolving the parties' objections, the Court is mindful that summary judgment evidence need not be "submitted 'in a form that would be admissible at trial.'"[15]  Indeed, as the advisory committee's note to the 2010 Federal Rule amendments explain: "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."[16]  "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."[17]  "Fed. R. Civ. P. 56(c)(1)(A) specifically permits a party to support its factual assertions by means of a deposition transcript or affidavit, even though these are forms of evidence that are

---

[12] *Black v. Baker Oil Tools, Inc.*, 107 F.3d 1457, 1460 (10th Cir. 1997).

[13] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[14] *Bacon v. Great Plains Mfg., Inc.*, 958 F. Supp. 523, 526 (D. Kan. 1997) (citation omitted).

[15] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[16] Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.

[17] *Brown*, 835 F.3d at 1232 (citations omitted).

usually inadmissible as hearsay at trial."[18]  However, "[c]ourts . . . should disregard any inadmissible statements . . . contained *within* affidavits or deposition transcripts that could not be presented at trial in any form."[19]  "Thus, although evidence presented in the form of an affidavit or deposition at the summary judgment stage can be 'converted' in form into live testimony at trial, the content or substance must be otherwise admissible . . . ."[20]

The Court excludes evidence offered through affidavits and deposition testimony that would not be admissible at trial, including evidence that is not relevant,[21] evidence that is hearsay for which no exception to the hearsay rule is apparent,[22] and evidence that is not based on the witness's personal knowledge.[23]  Furthermore, the Court disregards conclusory allegations without specific supporting facts do not have probative value[24] and "statements of mere belief."[25] The Court will not separately address each and every objection raised by Walmart, although it notes some specific rulings where necessary throughout this opinion.

One evidentiary issue merits further discussion.  Walmart objects to Isberner's reliance on evidence of alleged gender-based discrimination by Market Manager Chad Rohr against other female employees, which she offers to show that Rohr's conduct toward her was motivated by

---

[18] *Wunder v. Elettric 80, Inc.*, No. 13-4014-KGS, 2014 WL 4059763, at *2 (D. Kan. Aug. 15, 2014) (first citing *Dodson Aviation, Inc. v. HLMP Aviation Corp.*, No. 08-4102-KGS, 2011 WL 1234705, at *8 (D. Kan. Mar. 31, 2011); then citing *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1210 (10th Cir. 2010); and then citing *Garcia-Martinez v. City & Cnty. of Denver*, 392 F.3d 1187, 1191 (10th Cir. 2004)).

[19] *Id.* (citing *Dodson*, 2011 WL 1234705, at *9).

[20] *Id.* (citing *Dodson*, 2011 WL 1234705, at *9); *Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1250 (10th Cir. 2013) (first citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 327 (1986); then citing *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995); and then citing Fed. R. Civ. P. 56(c)(4)).

[21] Fed. R. Evid. 401.

[22] Fed. R. Evid. 801–807.

[23] Fed. R. Evid. 602.

[24] *Fitzgerald v. Corr. Corp. of Am.,* 403 F.3d 1134, 1143 (10th Cir. 2005) (citations omitted).

[25] *Argo v. Blue Cross Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

discriminatory animus.  Specifically, Walmart seeks to preclude Isberner from relying on evidence of Rohr's behavior toward store managers Kelly Wehling and Stephanie Sullivan, as well as evidence of two anonymous gender-discrimination complaints against Rohr.

"The Tenth Circuit has long agreed that evidence of treatment of other employees in the same protected class may be relevant to the issue of discriminatory intent."[26]  The key question in determining the admissibility of "me too" evidence is "how closely related the evidence is to the plaintiff's circumstances and theory of the case."[27]  There must be some nexus between the alleged discriminatory acts and the decision being challenged.[28]  "[A]necdotal evidence of discrimination should only be admitted if 'the prior incidences of alleged discrimination can somehow be tied to the employment actions disputed in the case at hand.'"[29]  For example, "me too" evidence may be admissible where the plaintiff presents evidence that the supervisor who discriminated against others had a "connection to plaintiff's chain of command."[30]  "[E]vidence that makes a defendant's proffered justification more or less likely to be pretextual is relevant evidence."[31]  The relevance of this evidence is "fact-sensitive and must be 'determined in the context of the facts and arguments in a particular case.'"[32]

Walmart contends that Isberner's "me too" evidence is inadmissible because it involves individuals who were not similarly situated to Isberner—Wehling and Sullivan were store

---

[26] *Allen v. Magic Media, Inc.*, No. 09-4139-SAC, 2011 WL 903959, at *3 (D. Kan. Mar. 15, 2011) (collecting cases).

[27] *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008).

[28] *Mendelsohn v. Sprint/United Mgmt. Co.*, 587 F. Supp. 2d 1201, 1218 (D. Kan. 2008).

[29] *Mendelsohn v. Sprint/United Mgmt. Co.*, 402 F. App'x 337, 340 (10th Cir. 2010) (alteration in original) (quoting *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 856 (10th Cir. 2000)).

[30] *Mendelsohn*, 587 F. Supp. 2d at 1218.

[31] *Mendelsohn*, 402 F. App'x at 340 (citing Fed. R. Evid. 401).

[32] *Id.* at 342 (quoting *Mendelsohn*, 552 U.S. at 387).

managers who reported to Rohr, whereas Isberner and Rohr were both market-level managers and Rohr was not Isberner's supervisor.  Isberner counters that Rohr did play a supervisory role with respect to her employment and that, in any event, it is error to reject "me too" evidence solely on the basis that other victims of alleged discrimination had a different supervisor.  The Court agrees.

Walmart improperly equates the question of admissibility with the question of whether Sullivan and Wehling would be considered "similarly situated" to Isberner for the purposes of a disparate-treatment analysis.  The similarly-situated inquiry asks whether "a plaintiff has been treated differently from another employee who is not part of the protected class."[33]  In contrast, "me too" evidence is evidence that other employees belonging to the same protected class as the plaintiff were also discriminated against.[34]  Thus, the admissibility of "me too" evidence does not require that the nonparty employees be "similarly situated" under the disparate treatment standard, but that the testimony be relevant in the context of the facts and arguments in the case.[35]

Moreover, evidence regarding Rohr's treatment of Wehling and Sullivan is admissible "me too" evidence because it is closely connected to Isberner's circumstances and theory of the case, which is that she was discriminated against, subjected to a hostile work environment, and constructively discharged due to Rohr's abusive, animus-based behavior toward her.  Although Rohr was not Isberner's supervisor, Isberner offers evidence that he was the leader of her team, had some authority to discipline her, and was asked at least once to formally weigh in on her annual evaluation.  She also offers evidence that she was required to provide Rohr with HR

---

[33] *Dindinger v. Allsteel, Inc*., 853 F.3d 414, 425 n.5 (8th Cir. 2017) (citing *Harris v. Chand*, 506 F.3d 1135, 1140−41 (8th Cir. 2007)).

[34] *Id.* (citing *Mendelsohn*, 552 U.S. at 386).

[35] *Id.* at 425 & n.5 (citation omitted).

support.  From this evidence, it is apparent that Rohr had a connection to Isberner's chain of command, as he did with respect to Sullivan and Wehling, who were his direct reports.

Walmart contends that Sullivan's testimony is "irrelevant as a matter of law" because it relates to events too remote in time from the discrimination Isberner alleges.[36]  Isberner offers evidence regarding alleged incidents of discrimination against Sullivan by Rohr that occurred over a period of time but culminated with Sullivan's resignation in 2014, not long before Rohr allegedly began to subject Isberner to disparaging comments about her gender.  The Court finds that this evidence is admissible, where supported by personal knowledge, because it is logically tied to Isberner's theory of the case and relates to "the same type of discrimination during the same time period under similar circumstances."[37]

As to both Sullivan and Wehling, Walmart cloaks attacks on witness credibility in the guise of evidentiary objections.  Walmart argues that Sullivan's allegations of discrimination are inadmissible because they are undermined by her own testimony and because she never raised concerns about Rohr's treatment at any time during her employment or after her 2014 resignation until her deposition in this case in 2021.  Further, Walmart points out that Wehling, who was terminated, had accused both Rohr and Isberner of discriminatory behavior, which Isberner denies.

But it is "axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment."[38]  The Court thus declines to evaluate the credibility of Sullivan or Wehling.  Rather, the Court determines only that Isberner's "me too" evidence is admissible

---

[36] Doc. 54 at 39.

[37] *Crumpacker v. Kan. Dep't of Human Res.*, No. 00-4044-RDR, 2004 WL 1846146, at *5 (D. Kan. June 10, 2004) (citing *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 856 (10th Cir. 2000)).).

[38] *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) (first citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); and then citing *Koopman v. Water Dist. No. 1*, 972 F.2d 1160, 1164 (10th Cir. 1992)).

because it is closely tied to the theory of Isberner's case—there is a nexus between the alleged discriminatory acts against Wehling and Sullivan and the discrimination Isberner alleges.  To the extent that Wehling's and/or Sullivan's testimony consists of hearsay or lacks foundation, the Court has excluded it.

Finally, as to the two anonymous complaints about Rohr submitted in 2017, Walmart objects that these reports are inadmissible because they consist of hearsay and double hearsay, lack foundation, and are "inaccurate."[39]  Such out-of-court statements, if offered to prove that Rohr engaged in discriminatory conduct, are inadmissible absent a showing that the declarant would testify at trial or that an exception to the rule against hearsay applies.[40]  However, to the extent that these reports are offered not for the truth of the matters asserted therein but only to show that Walmart failed to investigate allegations against Rohr, they are non-hearsay and admissible for that purpose.[41]  And although these anonymous reports may lack context to show that the statements therein are based on the declarants' personal knowledge or observations, Walmart apparently allows its employees to report alleged misconduct anonymously and considers such reports a sufficient basis to conduct an investigation.  The Court thus admits these statements for the limited purpose of establishing what actions Walmart did or did not take with respect to Rohr, Isberner's alleged harasser.

---

[39] Doc. 54 at 42.

[40] *See, e.g., Feldmann v. Lakeview Loan Servicing LLC*, No. C20-580 MJP, 2021 WL 1627048, at *2 (W.D. Wash. Apr. 27, 2021) (finding anonymous complaint posted on website inadmissible where plaintiff provided no information that would permit complaint to be admitted through a hearsay exception); *Wellington v. Spencer-Edwards*, No. 16 Civ. 6238 (AT), 2019 WL 2764078, at *3 (S.D.N.Y. July 1, 2019) (finding anonymous complaint to be inadmissible hearsay); *Rao v. Rodriguez*, No. 14-CV-1936 (NGG) (ST), 2017 WL 1403214, at *5 (E.D.N.Y. Apr. 18, 2017) (finding anonymous complaint inadmissible to show that an individual made racially sensitive remarks); *Sherrell v. Winter*, No. 05-00034 JMS/BMK, 2007 WL 61058, at *16 n.18 (D. Haw. Jan. 8, 2007) (excluding anonymous complaint as inadmissible hearsay).

[41] *See, e.g., Lewis v. Cassady*, No. 13-1194-CV-W-BP-P, 2014 WL 1607598, at *4 (W.D. Mo. Apr. 22, 2014); *Brauninger v. Motes*, 260 F. App'x 634, 637 (5th Cir. 2007).

B.      **Uncontroverted Facts**

The following material facts are either uncontroverted, stipulated, or viewed in the light most favorable to Isberner.  The Court does not consider facts presented by the parties that the record does not support or that are not relevant to the legal issues presented.  Nor does the Court consider legal arguments included in the parties' statements of fact.

### *Isberner's Employment as a Market Human Resources Manager*

Isberner was fifty-five years old when Walmart hired her in 2008 for the position of Market Human Resources Manager ("MHRM").  At all times relevant to this action, Isberner suffered from Addison's Disease, alcoholism, and depression.  Isberner worked as an MHRM for Walmart until she tendered her resignation in March 2019.

As an MHRM, Isberner was a salaried member of Walmart's management.  Her MHRM job description included "participating in and supporting community outreach events," and "[c]ollaborat[ing] with stakeholders (for example, Store Manager, Market Manager, regional leadership)."[42]  In her role as an MHRM, one of Isberner's primary job responsibilities was conducting investigations of complaints of employee misconduct submitted to Walmart's Global Ethics office ("Global Ethics"), a department dedicated to receiving, investigating, and managing claims of associate misconduct.  While the Global Ethics office exists to investigate ethics complaints, not all complaints were formally submitted to that office, and Isberner investigated both formal and informal complaints.

From at least 2012 to 2019, Isberner was responsible for a geographic region of Walmart's stores known as "Market 406."  Isberner's position required working with other market-level members of Market 406, including Market Manager Chad Rohr.  As an MHRM, Isberner's direct

---

[42] Doc. 51-2 at 1.

supervisor was the Regional Human Resources Manager ("RHRM").  Heidi Palmer was Isberner's RHRM from December 2017 to March 2019.  However, Rohr was the head of the Market 406 team, and from 2009 to March 2019, Isberner was required to work with and provide human resources support to Rohr.  Rohr did not have the authority to fire or demote Isberner; however, he had the ability to discipline and could provide input on any termination decision involving her.[43]

### *Walmart's Relevant Policies*

During the time period at issue in this case, Walmart maintained a written policy entitled, "Discrimination and Harassment Prevention Policy" ("Anti-Discrimination Policy").  As an MHRM, Isberner was intimately familiar with the Anti-Discrimination Policy, which states, in part:

> **Reporting Procedures**
>
> . . . .
>
> If you experience conduct that may violate this policy or if you observe or become aware of any conduct that may violate this policy by being discriminatory, harassing or retaliatory; you should immediately report the violation to any salaried member of management or confidentially and/or anonymously to the Global Ethics Office . . . .  If you believe a salaried member of management may be violating this policy, you do not have to report the violation to that person.  You may report the possible violation to another salaried member of management or call/email the Global Ethics Office.
>
> **Managers**
>
> If you observe, receive a report or otherwise become aware of a possible violation of this policy, you must immediately report such conduct to the *appropriate level of management* for investigation. A salaried member of management who fails to report a violation of

---

[43] Walmart's objection that Isberner's lacks personal knowledge of this fact is overruled.  Her personal knowledge about Rohr's supervisory authority can be inferred from her role as an MHRM.

this policy may be subject to disciplinary action, up to and
including termination.[44]

As an MHRM, Isberner understood that a market manager treating female associates
significantly worse than male counterparts based on their sex would constitute discrimination
under Walmart's Anti-Discrimination Policy. Isberner also understood that the written Anti-
Discrimination Policy prohibited taking negative action against any person who reported conduct
that might violate the policy. The policy states that Walmart "will take appropriate steps to
ensure that there is no retaliation of any kind for using the reporting procedures described in this
policy. Retaliation of any kind for using the reporting procedures is strictly forbidden and
violates this policy."[45]

At all relevant times, Walmart also had a written "Open Door Communications Policy"
("Open Door Policy"), which provides that associates may bring concerns or issues to the
attention of any supervisor or manager. Isberner was aware of the Open Door Policy and, prior to
March 12, 2019, had twice personally utilized it to address concerns. On one occasion, Isberner
testified that "it was not a good experience," and on the other occasion, she stated "yes" when
asked if it was "productive" in bringing about change.[46]

### Isberner's Interactions with Rohr from 2014–2017

Between 2014 and 2016, Rohr made repeated comments to and in front of Isberner that
referenced her age, gender, and alcoholism that made her uncomfortable. On two or three
occasions in 2014 or 2015, Rohr commented to Isberner that she was close to his mother's age.

---

[44] Doc. 45-2 at 3.

[45] *Id.*

[46] Isberner Dep., Doc. 51-1 at 79:16, 80:9−13.

On approximately three or four occasions in 2016, Rohr introduced Isberner in meetings with a reference to the "Most Interesting Man in the World" beer advertisement. Although Rohr did not expressly say anything about Isberner's alcoholism when referring to her in this manner or otherwise disclose to anyone that Isberner was a recovering alcoholic, Isberner understood his comments to be a reference to her status as a recovering alcoholic, and some of the hourly associates and managers present when Rohr made these comments were aware that Isberner was a recovering alcoholic.

Also in 2016, Rohr began referring to Isberner as the "crazy HR lady" during teleconference calls, training calls, and meetings. Isberner never heard Rohr refer to anyone else as "crazy." In May 2016, Isberner told Rohr that his "crazy HR lady" comments offended her, to which Rohr replied that he was just kidding around. Rohr continued to refer to Isberner in this manner more than a dozen times.

Former Walmart Associate Vi Bumgardner told Isberner that sometime in 2016 or earlier, Rohr told Bumgardner that he did not trust people who don't drink alcohol. Isberner never personally heard Rohr say that he did not trust non-drinkers, but admits that he made that statement in jest approximately five times over a period of five years. Isberner never said anything to Rohr about these comments until she raised the issue with him on March 11, 2019, which was her last day in the office before her resignation.

Isberner never reported any of Rohr's comments to an RHRM, Rohr's supervisor, or Global Ethics.

Rohr either never participated or at some point stopped participating in multiple Walmart initiatives spearheaded by Isberner, including the mentoring circles initiative that Isberner had developed and implemented between 2012 and 2018. Isberner testified that Rohr never

participated in investigations unless they related to one of his store managers.  Isberner further testified that Rohr's lack of participation in these initiatives hurt her ability to meet certain leadership metrics on which she was evaluated, although she was never disciplined during her time at Walmart for failure to meet performance metrics or for any other reason.

### Spring 2018 Women in Leadership Conference

In the spring of 2018, Market 409—the geographic Walmart market neighboring Isberner's market—organized and presented a Women in Leadership Conference ("WIL Conference").  Jeff Livingston, the MHRM for Market 409, led these efforts.  Though Isberner had participated in planning this conference for the five previous years, Livingston did not invite her to participate in planning the 2018 conference.  Rohr participated in some of the planning meetings.  Isberner testified that being involved in the WIL Conference in the past had supported her standing as a woman in a leadership role.

### Isberner's 2018 Interactions with Rohr

On June 16, 2018, Isberner and Rohr attended a market meeting in Dodge City that was also attended by other members of the Market 406 team, including store managers.  During that meeting, Rohr accused Isberner of allowing her subordinates to blame his subordinates for everything, and verbally attacked Isberner by calling her a liar, interrupting her, and yelling at her in front of the others present.  Rohr did not make any reference to Isberner's age, sex, or disability during this confrontation.

In late 2018, several employees asked Isberner whether Rohr was romantically involved with another Walmart manager; they reported to her that there were rumors that Rohr and this manager were so involved.  Isberner sought out confidential advice and guidance about how to handle these reports from a peer MRHM, Market 409's Livingston.  Soon thereafter, Rohr

confronted Isberner, accusing her of spreading rumors about him.  Isberner explained to him why she had discussed the matter with Livingston—to seek advice on how to handle reports of the rumored affair.  But Rohr told Isberner that he did not believe her explanation.  Ultimately, Isberner determined there was no basis to investigate or escalate the reports she had received about Rohr.

### *Isberner's November 2018 Meeting with Palmer*

On October 21, 2018, Isberner emailed Palmer about some of the issues and concerns she had about her job, including concerns about her working relationship with Palmer.  Isberner's email did not make any reference to Rohr.  In response to Isberner's email, Palmer traveled from Denver to meet with Isberner in person in early November.

At that meeting, Isberner told Palmer about Rohr's conduct at the June 16, 2018 meeting in Dodge City when he verbally attacked her in front of her coworkers.  Isberner reported to Palmer that Rohr did not like women in positions of power, and she recalls talking about the way Rohr treated her and store managers Stephanie Sullivan and Cynthia Owens.  Isberner was very emotional during her meeting with Palmer; she was crying.  She testified that because she was so emotional, she does not recall all the details of what was said, but she remembered telling Palmer in "very vague, general" terms that Rohr was hostile and abusive toward "people."[47]  When asked whether she told Palmer that the deterioration of her working relationship with Rohr had anything to do with her being a woman, Isberner testified: "I don't think that I—that I did or that I would have."[48]  But Isberner did recall telling Palmer that Rohr would not work with her, that he was

---

[47] *Id.* at 116:20−25.

[48] *Id.* at 118:19−119:1.

hostile and aggressive toward her, and that he would not be as hard on or treat a man in the same way.

Isberner further discussed with Palmer that she did not feel that it was "okay" when she was ill and needed to take FMLA leave.[49]  Isberner felt pressure from both Palmer and Rohr to return to work from FMLA leave in February 2018, despite her understanding that she had an absolute right to take FMLA leave and that neither Rohr nor Palmer (nor anyone else) had the authority to force her to return early from leave.  Isberner testified that while she was on leave, Palmer held a meeting during which she called Isberner and asked why she wasn't at work and when she was going to return.

Isberner felt attacked by Palmer during the November 2018 meeting because Palmer was not listening to her, and she told Palmer during the meeting that she felt "very unsafe right now."[50]  Isberner was not afraid that something might happen during or as a result of the meeting; rather, her fear was "a combination of the emotions and the concerns."[51]  Although feeling fearful, at the conclusion of the November 2018 meeting, Isberner told Palmer that she felt they had had a good conversation.  Isberner did not report any of the information she shared with Palmer to Global Ethics.  Palmer never communicated to Rohr that Isberner had raised any issue, concern, or complaint that Rohr had subjected her to discriminatory, harassing, or retaliatory conduct.

During the last six months of her employment, Palmer became less responsive to Isberner's emails.  When Isberner attempted to follow-up by call or text, Palmer only sometimes responded.[52]

---

[49] *Id.* at 119:2−15.

[50] *Id.* at 116:17−19.

[51] *Id.* at 245:23−25.

[52] Walmart objects to the admissibility of Isberner's testimony about Palmer's and Rohr's responsiveness under the best-evidence rule.  Walmart contends that Isberner is obligated to produce copies of emails and text

Between her November 2018 meeting with Palmer and her resignation email on March 12, 2019, Isberner did not complain to Walmart that she had been subjected to discriminatory or retaliatory behavior.

### *The Liberal Investigation*

In February 2019, Isberner was assigned to investigate a race discrimination complaint against the Walmart store manager in Liberal, Kansas ("Liberal Investigation").  Before traveling to Liberal, Isberner contacted Rohr and asked him to serve as a witness for the investigation, and Rohr agreed to do so.  Isberner then traveled to Liberal, expecting that Rohr would be present to serve as the witness for the interviews she intended to conduct.  But Rohr was not there when Isberner arrived.  When Isberner called Rohr, he stated that he was not coming and would not be serving as her witness.  Isberner then immediately called Palmer and informed her that Rohr was not present to serve as her witness despite committing to do so, but that she had a plan to proceed despite Rohr's absence.  Because Isberner was unable to conduct a formal investigation without a witness, she instead conducted four or five factfinding interviews with Walmart associates in the Liberal store, unrelated to the race discrimination complaint.  Isberner expected to return to Liberal in the future to finish the investigation of the race discrimination complaint.

After speaking with Isberner, Palmer called Rohr, who denied that Isberner had asked him to serve as a witness.  Based on her conversations with Isberner and Rohr, Palmer concluded that Isberner had not properly prepared for the investigation, had not conducted the initial portions of the investigation properly, and had not been entirely truthful regarding the absence of a witness.

---

messages to which Palmer and Rohr failed to respond.  However, "[t]he best-evidence rule does not apply to testimony relating to the *existence* of a document, as opposed to its contents."  *United States v. Iverson*, 818 F.3d 1015, 1023 (10th Cir. 2016) (citing Fed. R. Evid. 2001).  Isberner does not testify to the contents of any particular communication, but rather to a failure to communicate.  This objection is overruled.

### *Isberner's Performance Evaluations*

Walmart's employees receive annual performance evaluations and those ratings factor into their compensation.  Isberner's RHRM was responsible for completing her annual performance evaluations.  From at least 2012 through 2017, Isberner received an annual evaluation score of "Solid Performer."  For the annual evaluation period of February 2017 through January 2018, Palmer solicited feedback from Rohr to complete Isberner's evaluation, because Palmer was new to her position.  Based on Rohr's positive input, Isberner received a higher annual evaluation score of "Exceeds Expectations" for the period of February 2017 through January 2018.  This score is a step above the "Solid Performer" ranking Isberner received for each of the preceding five years.

In February 2019, shortly after her visit to Liberal, Isberner attended an in-person meeting with Palmer and Palmer's immediate supervisor, Regional Operations Manager David Carmen, to discuss Isberner's annual evaluation for the preceding year.  Palmer and Carmen voiced three primary criticisms of Isberner's performance during that meeting.  First, they were critical of her handling of the Liberal Investigation based on Palmer's belief that Isberner had failed to properly prepare for the investigation by securing a witness.  Palmer also told Isberner that one of the interviews Isberner conducted there had caused a disturbance.  Second, Palmer and Carmen were critical of Isberner's lack of in-person visits to stores.  Isberner agrees that this criticism was well-founded regarding the last few months prior to the evaluation.  Third, Palmer and Carmen criticized Isberner for sending an email regarding a deceased associate.  They also told Isberner that she needed to be more inspirational, motivational, and better at leading change.  Isberner did not raise any complaints about Rohr during this meeting.

For Fiscal Year 2019, Walmart's recommended curve for ranking associate performance stated that 5% should be ranked "Role Model," 20% should be "Exceeds Expectations," 65% should be "Solid Performer," 5% should be "Development Needed," and 5% should be "Below Expectations."[53]  Within the "Solid Performer" group, Walmart further recommended that associates be placed into one of three categories—low, average, and top—with the greatest financial rewards going to the highest performers.

Isberner was given a performance ranking of "Solid Performer" during her 2019 evaluation meeting, which is lower than the "Exceeds Expectations" ranking she received the previous year but consistent with the ranking she had received in prior years.  Isberner testified that this ranking did not surprise her and that "Solid Performer" is "not at all" a bad or negative rating.[54]  Although Isberner's "Solid Performer" ranking would place her in the same category as the majority of her peers according to Walmart's recommended curve, Palmer ranked Isberner as one of the two "lowest performing solids" among those Palmer supervised and recommended that Isberner receive the lowest raise (1.5%) among those in the "Solid Performer" category.[55]  The highest raise Palmer recommended for someone in the "Solid Performer" category was 3%.

Isberner was not formally disciplined, her base compensation was not reduced, and she was not demoted as a result of her 2019 performance evaluation.  Nonetheless, Palmer and Carmen informed Isberner that she was being removed and replaced as the lead investigator for the Liberal Investigation.  This was the first and only time Isberner was removed from an investigation.  Isberner viewed her removal from the Liberal Investigation, which resulted in a decrease in her job responsibilities, as disciplinary in nature.  And Rohr testified that he could not

---

[53] Doc. 53-5 (under seal).

[54] Isberner Dep., Doc. 51-1 at 76:21.

[55] Doc. 53-4 at 3 (under seal).

recall any other Walmart employee being removed from an investigation after being assigned to conduct it.

Isberner testified that while Palmer and Carmen did not yell at her during her 2019 performance evaluation meeting, they were hostile and "stern" in tone, and that she felt "personally insult[ed]" and "beat up."[56]  Isberner felt that Palmer and Carmen gave a "very clear message" that they did not want Isberner there.[57]

### *Isberner's Early 2019 Interactions with Rohr*

In early 2019, Rohr told Palmer that he was not comfortable speaking with Isberner alone. Palmer did not ask Rohr why, and she told Rohr that  he and Isberner should work out their problems but he did not have to speak with Isberner alone if that made him uncomfortable. Palmer did not tell Isberner that she gave Rohr permission not to speak to Isberner alone.

At a corporate meeting in Dallas on January 14, 2019, Rohr refused to speak with Isberner and left the table as she approached.  On March 5, Isberner and Rohr attended a meeting in Wichita.  At the conclusion of the meeting, Isberner asked Rohr if he had time to "go over some things."[58]  Rohr responded that he did not have time and left.  Isberner testified that Rohr ignored her emails, calls, and text messages after the March 5 meeting, and that her inability to communicate with Rohr in the week following resulted in her being unable to finalize plans for an upcoming training.

On March 11, 2019, Isberner spoke with Rohr regarding finalizing plans for an upcoming training and other work issues.  Two other Walmart employees were present during this discussion.  Isberner again asked Rohr to meet privately with her.  Rohr responded that he would

---

[56] Isberner Dep., Doc. 51-1 at 69:22−24; 70:12−13; 73:21−25; 84:14−21; 85:24−86:5.

[57] *Id.* at 85:24−86:5.

[58] *Id.* at 265:16−266:1.

never speak with Isberner alone due to his belief that she had been spreading rumors about him having an affair, but that he would speak with her in the presence of the other market members. Isberner felt that speaking in front of the two employees present would be inappropriate because one was her peer and the other was a subordinate.

Rohr was extremely angry and told Isberner that he did not believe she was telling the truth about her investigation into his rumored affair or what happened with the Liberal Investigation. Rohr called her a liar and refused to listen to her. Isberner's interaction with Rohr on March 11, 2019 was one of two instances Isberner could specifically recall in which Rohr's behavior made her feel unsafe or in danger of physical harm, the other being a confrontation that occurred in 2010 or 2011, after which Rohr apologized. But Isberner testified that while these were the only two interactions that stuck out in her mind, feeling unsafe was an "ongoing" issue.[59] Similarly, Isberner testified that while she could recall and describe only four specific instances of Rohr's verbal abuse (the June 2018 Dodge City Meeting, the fall 2018 confrontation about the alleged affair, Rohr's March 5, 2019 refusal to meet with her, and the March 11 confrontation), these instances were not the only ones. Rather, these were the "toughest" instances of verbal abuse.[60] She stated that Rohr "could just blow up" and was "very unpredictable."[61]

Isberner did not inform anyone that Rohr declined to meet with her after the meeting on March 5, 2019. And Isberner did not report Rohr's behavior on March 11, 2019 to Palmer, to Rohr's supervisor, or to Global Ethics prior to her resignation. Isberner testified that "after the culmination of so many of these instances . . . [she] felt very diminished as a person," and that "it

---

[59] *Id.* at 190:9–12.

[60] *Id.* at 191:10−17.

[61] *Id.*

made no sense to report it to anyone on March 11th."[62]  While Isberner later told Palmer about Rohr's behavior on March 11, Palmer testified that she was aware of only one meeting during which Isberner felt uncomfortable, and lacked specific details.

### *Rohr's Interactions with Other Female Employees*

Isberner witnessed Rohr publicly ridicule, reprimand, and/or belittle other female managerial employees of Walmart, including store managers Kelly Wehling and Stephanie Sullivan, and co-manager Diana Johnston.  Rohr told Isberner that he wanted store manager Cynthia Owens removed from her store, and Isberner believed that Rohr worked to remove Wehling, Sullivan, Johnston, and store manager Marilyn Kokojohn from their positions.  Isberner observed Rohr provide specific feedback to five male store managers that she did not observe him provide to female store managers Sullivan, Wehling, and Owens.  She testified that although she attempted to intervene when Wehling made her complaint about Rohr, she "was basically ignored."[63]

Other than Isberner, at least five female employees reported that Rohr regularly yelled and screamed at them.  Wehling testified to one incident, witnessed by Isberner, in which Rohr yelled in her face.  Sullivan testified that Rohr raised his voice toward her a couple of times per year, and that she witnessed Rohr raise his voice toward male employees.  In 2016, Wehling filed a complaint with Global Ethics accusing Rohr, Isberner, and others from the Market 406 team of harassing her.  Wehling alleged that Isberner told her that Rohr did not like women.  Wehling later reported to Global Ethics that Isberner appeared to be retaliating against her.  Walmart investigated and concluded that Wehling's allegations against Rohr and Isberner were

---

[62] *Id.* at 275:13−276:2.

[63] *Id.* at 77:8−17.

unsubstantiated.  Wehling was terminated in the spring of 2017, after an investigation into more than fifty associate and customer complaints against her.  Wehling sued Walmart, alleging that Rohr harassed her and created a hostile work environment.  The lawsuit settled.

Sullivan believes that Rohr had a problem with her because she was a strong, outspoken, opinionated woman, and that he discriminated against her on the basis of her gender because Rohr would exclude Sullivan when he socialized with male employees outside of work and made comments about Sullivan's pregnancy and weight.[64]  Isberner testified that Rohr belittled Sullivan.  She reported Rohr's treatment of Sullivan to her supervisor and to Rohr's supervisor.

In mid-September 2014, Sullivan had a heated meeting with Rohr during which she resigned her employment.  She testified that Rohr's treatment of her contributed to her decision to resign.  Sullivan never reported Rohr to any supervisor or manager and never filed a formal complaint, because she "felt like some of them would have already been in the know [that] it was acceptable treatment at the market level."[65]  Sullivan did not file a complaint because she believed that doing so could jeopardize her job and would be futile.

During the eleven years she worked with Rohr, around fourteen to sixteen women complained to Isberner that Rohr had discriminated against them on the basis of their gender. Isberner personally investigated twelve of those complaints but was unable to substantiate them; she did not lodge a formal complaint, report Rohr to management, or alert Global Ethics. Regarding the remaining two to four complaints, Isberner testified that if she did anything, it

---

[64] Walmart objects that Sullivan's testimony is vague and conclusory because she offers no specific examples of discriminatory conduct.  *See, e.g.*, *Bird v. W. Valley City*, 832 F.3d 1188, 1206−07 (10th Cir. 2016).  The objection is overruled.  Sullivan cites Rohr's failure to invite her to social events with the other male managers, comments about her pregnancy and weight, and bullying behavior toward herself and others.  Walmart also objects that Sullivan lacks personal knowledge about how Rohr treated male employees.  This objection goes to the weight and not the admissibility of Sullivan's testimony and is therefore overruled.

[65] Sullivan Dep., Doc. 51-9 at 50:5−11.

would have been "to talk and listen to them and then provide them some—some ideas in terms of what things they could do different."[66]

Finally, in the summer of 2017, Walmart received two anonymous reports that Rohr had engaged in gender discrimination by treating female store managers differently than male store managers.[67]

### Isberner's Resignation

Isberner testified that neither her RHRM nor anyone at the regional or divisional level ever told her she would be fired or gave her reason to believe that she should be fearful for her job. Nonetheless, Isberner became fearful for her job based on the behavior of Rohr and Palmer toward her, including Rohr's refusal to support certain initiatives, his refusal to communicate with her beginning around late 2018, and Palmer ignoring many of Isberner's communications around the same time. Isberner believed Rohr and Palmer would collude to get her fired, or that she was being "worked out,"[68] and felt that no one would be able to endure her working conditions.

At 3:00 a.m. on March 12, 2019, during the overnight hours following her confrontation with Rohr on March 11, Isberner sent an email to Palmer and Stokes resigning from Walmart. In that email, Isberner stated, in part:

> [Rohr] refused to talk alone with me and accused me of lying about the [Liberal] investigation which I strongly disagree with. He has verbally attacked me, made false allegations and publicly shamed and accused me not only today but several times in recent months. He is [an] angry man that verbally boxed me into a corner. I have felt unsafe and fearful for my job and my emotional self.[69]

---

[66] Isberner Dep., Doc. 51-1 at 113:12−18.

[67] Walmart's hearsay objection to this report is overruled because it is not offered for the truth of the matter asserted. Fed. R. Evid. 801(c)(2).

[68] Isberner Dep., Doc. 51-1 at 300:17−301:12.

[69] Doc. 45-5 at 2.

Isberner's email also faulted Palmer and Stokes for failing to seek out her side of the situation with Rohr and shared that she was suffering from depression.

In a telephonic post-resignation Open Door meeting between Isberner, Palmer, and Stokes, Isberner elaborated upon and raised additional examples of Rohr's misconduct, including confronting Isberner about spreading a rumor about his alleged affair, his refusal to participate in certain initiatives including the mentoring circles she developed, his refusal to speak with her at the January 2019 Dallas meeting, and his refusal to speak with her alone.

Isberner told Palmer and Stokes that:

> [Rohr] and I had a great relationship.  I loved working with him.  We worked well together.  We fought well together, but we always trusted that we would come back and work through it, and we always hugged, and you know, it was always, hey, I love you, man type thing.
>
> That has changed.  That has changed, I would say, since about a year ago.  And just a series of events that have been—that have gotten significantly worse.[70]

Isberner traced the change back to the WIL conference on April 24, 2018, when she had a "conflict" with Livingston, who was an ally of Rohr's.  Isberner also told Palmer and Stokes that in the past, Rohr had treated Livingston like Rohr had been treating Isberner lately.  Isberner did not expressly state in either her March 12 email or in the subsequent Open Door meeting with Palmer and Stokes that she had been subjected to discrimination or retaliation.

Palmer did not tell Stokes that she had advised Rohr that he did not have to speak to Isberner alone if it made him uncomfortable.  After the Open Door meeting, Stokes directed Palmer to contact Livingston and Amy Williams, the Market Manager for Market 409, to follow up on Isberner's report about the confrontation she had with Rohr over the reports of his alleged

---

[70] Doc. 51-12 at 6; Doc. 55-5 at 11:1−11.

affair.  Stokes did not direct Palmer to speak to Rohr about any other issues Isberner had raised, and neither Palmer nor anyone else ever spoke to Rohr about these issues.  After Palmer determined that neither Livingston nor Williams could provide any detail, Stokes advised Palmer to accept Isberner's resignation.

On or about June 24, 2019, Isberner filed a charge of discrimination against Walmart with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on sex, age, and disability, as well as retaliation.[71]

## III.    Discussion

Isberner brings claims against Walmart for violations of Title VII (Count I), the ADEA (Count II), and the ADA (Count III).  Under each statute, she alleges that Walmart subjected her to a hostile work environment, constructive discharge, and other forms of discrimination. Isberner also brings a retaliation claim under Title VII (Count IV).  Walmart seeks summary judgment on all of Isberner's claims, arguing that her ADA and ADEA claims are barred by her failure to timely exhaust administrative remedies, and that she has failed to establish a prima facie case of hostile work environment, constructive discharge, discrimination, or retaliation.  Walmart additionally argues that Isberner's hostile work environment claims under all three statutes are barred by the *Faragher-Ellerth* defense.  The Court begins by addressing the administrative exhaustion issue, followed by the merits of Isberner's hostile work environment, constructive discharge, discrimination, and retaliation claims.

---

[71] Doc. 1-1.

A.      **Exhaustion of Administrative Remedies on ADA and ADEA Claims**

Both the ADA and the ADEA require a plaintiff to exhaust her administrative remedies by filing a charge with the EEOC within 300 days of the alleged discrimination.[72]  A plaintiff's failure to exhaust administrative remedies is no longer a jurisdictional bar to suit, but instead "permits a defendant only an affirmative defense."[73]  The defendant has the burden of proof on the affirmative defense, and in moving for summary judgment, "[t]he defendant . . . must demonstrate that no disputed material fact exists regarding the affirmative defense asserted."[74]  Once the defendant makes this initial showing, "the plaintiff must then demonstrate with specificity the existence of a disputed material fact.  If the plaintiff fails to make such a showing, the affirmative defense bars [her] claim, and the defendant is then entitled to summary judgment as a matter of law."[75]

Walmart argues that the only alleged age-discriminatory conduct in this case—Rohr commenting approximately four times that Isberner being close in age to his mother made him uncomfortable—occurred in 2014 or 2015, and that Isberner's 300-day deadline to file her EEOC charge with respect to that conduct expired no later than late 2016.  Walmart similarly argues that all of the conduct alleged to support Isberner's disability discrimination claim—Rohr's "Most Interesting Man in the World" and "crazy HR lady" comments in 2016, his statement that he did not trust non-drinkers in 2016 or earlier, and Palmer and Rohr pressuring Isberner to return from

---

[72] 42 U.S.C. § 12117(a) (incorporating Title VII's enforcement provisions (found in 42 U.S.C. § 2000e-5) into the ADA); 29 U.S.C. § 626(d)(1).  "The 300 day limitation applies in those states that have statutorily prohibited discrimination," such as Kansas.  *Sloan v. Boeing Co.*, No. 95-3354, 1997 WL 8868, at *2 & n.4 (10th Cir. Jan. 19. 1997) (citation omitted). !Otherwise the limit is 180 days.  *Id.* (citation omitted).

[73] *Brown v. Keystone Learning Servs.*, 804 F. App'x 873, 882 (10th Cir. 2020) (citing *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1183 (10th Cir. 2018)).

[74] *Hutchinson v. Pfeil,* 105 F.3d 562, 564 (10th Cir. 1997) (citations omitted).

[75] *Id.*

FMLA leave she took in or around February 2018—all occurred no later than May 23, 2018, more than 300 days before Isberner filed her EEOC charge on June 24, 2019. Isberner does not dispute the timing of these events. Rather, she argues that Rohr's series of discriminatory actions toward her should be treated as one continuous act under the continuing-violation doctrine, and that because that continuous action ended with her constructive discharge within the limitations period, her EEOC charge was timely filed as to all of the forms of discrimination she alleges in this action.

### 1.    Discrete Adverse Employment Actions

The United States Supreme Court has explained that discrete discriminatory and retaliatory acts "such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify."[76] This type of "discrete retaliatory or discriminatory act 'occur[s]' on the day that it 'happen[s],'" and "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."[77] However, this precedent does not "bar an employee from using prior acts as background evidence in support of a timely claim."[78]

For claims alleging discrete adverse employment actions, the Court looks to the timing of the alleged adverse employment actions, not Rohr's comments. Isberner alleges five discrete acts of discrimination under the ADA and ADEA: (1) constructive discharge; (2) Rohr's failure to speak to her alone; (3) her 2019 performance review; (4) her removal from the Liberal Investigation; and (5) Rohr's refusal to participate in Plaintiff's initiative programs. All but the last alleged adverse employment action occurred within 300 days of Isberner's administrative charge. As for this last discrete act, Isberner alleges that Rohr refused to take part in various

---

[76] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

[77] *Id.* at 110, 113; *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1178 (10th Cir. 2011) (explaining that the Supreme Court's ruling in *Morgan* does not alter rule that discrete acts of discrimination "trigger the statute of limitations when announced to the claimant" (citing *Morgan*, 536 U.S. at 114)). .

[78] *Martinez v. Potter*, 347 F.3d 1208, 1211 (2003) (alteration omitted) (quoting *Morgan*, 536 U.S. at 113).

initiative programs over several years, spanning between 2012 and 2018.[79]  Any claim that Rohr

failed to participate in initiative programs before August 28, 2018 (300 days before she filed the

administrative charge), is untimely.  All other alleged discrete adverse employment actions

occurred within the limitations period and are timely exhausted.

### 2.    Hostile Work Environment Claims

Isberner also alleges hostile work environment claims under each of the three statutes.

"Hostile environment claims are different in kind from discrete acts.  Their very nature involves

repeated conduct."[80]  "The 'unlawful employment practice' therefore cannot be said to occur on

any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to

discrete acts, a single act of harassment may not be actionable on its own."[81]

> The timely filing provision only requires that [the] plaintiff file a
> charge within a certain number of days after the unlawful practice
> happened.  It does not matter . . . that some of the component acts of
> the hostile work environment fall outside the statutory time period.
> Provided that an act contributing to the claim occurs within the
> filing period, the entire time period of the hostile environment may
> be considered by a court for the purposes of determining liability.[82]

The Court therefore must determine "whether the acts about which an employee complains

are part of the same actionable hostile work environment practice, and if so, whether any act falls

within the statutory time period."[83]  The Tenth Circuit has recognized certain non-exclusive factors

that guide this analysis, such as:

---

[79] To the extent Isberner alleges that the failure to include her in planning the 2018 WIL conference is an
actionable discrete adverse employment action, it too is untimely.  This event occurred in the spring of 2018 and any
planning for that conference certainly preceded that date, outside the limitations period.

[80] *Morgan*, 536 U.S. at 115 (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348−49
(3d ed. 1996)).

[81] *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Croy v. Cobe Labs., Inc.*, 345 F.3d
1199, 1202 (10th Cir. 2003).

[82] *Morgan*, 536 U.S. at 117.

[83] *Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016) (citing *Morgan*, 536 U.S. at 120).

whether the pre- and post-limitations period acts were "related by type, frequency, and perpetrator." We have also looked to whether the acts occurred when the employee "was working in the same place." These factors are not exhaustive: *Morgan* "does not limit the relevant criteria, or set out factors or prongs." "[F]lexibility is useful in a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment."

Conversely, an employer will not be liable when there is "no relation" between the pre- and post-limitations acts, or if "for some other reason, such as certain intervening action by the employer," the later acts are no longer part of the same hostile work environment claim.[84]

Walmart argues that Rohr's sporadic and isolated comments referencing Isberner's age and disability in 2014–2016, and Palmer and Rohr pressuring Isberner to return from FMLA leave in early 2018, are unrelated to Rohr's alleged gender-based conduct that occurred within the limitations period. Isberner responds that the hostile work environment began "in approximately 2015 with Rohr's cumulatively discriminating comments," and "continued up to her constructive discharge, which was the product of years of discrimination and hostility, including age and disability discrimination."[85]

The post-limitations period acts Isberner alleges include Rohr's berating Isberner in front of her peers, refusing to speak to Isberner alone, refusing to participate in the Liberal Investigation, and refusing to participate in her initiative programs. She also alleges that Rohr influenced directly or indirectly her 2019 performance evaluation. And she alleges that Palmer contributed to the hostile work environment by allowing Rohr not to speak to her, by failing to investigate after

---

[84] *Id.* (first quoting *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005); then citing *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008); then quoting *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010); and then quoting *Morgan*, 536 U.S. at 118).

[85] Doc. 49 at 66.

she reported having issues in November 2018, and by failing to respond to Isberner's many attempts at communications with her about these issues.

These post-limitations period acts are certainly related to the pre-limitations period acts in that they involved one of the same perpetrators—Rohr.  However, the Court agrees with Walmart that they are not all related by type or frequency.  The two pre-limitations period comments by Rohr about Isberner's age are of a different type—humiliating comments about age versus aggressive conduct and refusal to engage—and were allegedly isolated to those two instances in 2014 or 2015.  There is no other evidence in the record suggesting age-based animus.  None of Isberner's "me too" evidence suggests age discrimination.  And there is no other evidence in the record that supports Isberner's assertion that Rohr's hostile and abusive conduct toward her in 2018 was related to her age.

Similarly, the only evidence suggesting disability-based animus are Rohr's pre-limitations period comments, and arguably Palmer's pressuring Isberner to return early from FMLA leave in 2018.  But Rohr's comments referencing Isberner's disability are unrelated by type and frequency to the post-limitations period conduct alleged by Isberner.   Rohr made three or four references to Isberner as "The Most Interesting Man in the World," which presumably referenced her alcoholism.  Around 2016, Rohr told one of Isberner's coworkers—who later repeated it to Isberner—that he did not trust people who don't drink alcohol.  Rohr estimates that he made this comment five times over a five year period, all of which predated the limitations period for the hostile work environment claim.  Rohr's "crazy lady" comments occurred more frequently and arguably reference both Isberner's gender and disability.  But again, these were different in type to Rohr's post-limitations period conduct, which was characterized by hostility and refusal to engage. Finally, the record reflects that in February 2018, Palmer made one phone call to Isberner while

Isberner was on FMLA leave asking when she was going to return to work in a manner that made Isberner feel pressured to return.  Assuming this phone call evidenced discriminatory animus on the basis of disability, Walmart has demonstrated that it happened one time and is unrelated to the post-limitations period conduct described above.

Therefore, Walmart's motion for summary judgment is granted on Isberner's hostile work environment claims under the ADEA and ADA for failure to timely exhaust.[86]

### B.    Hostile Work Environment Under Title VII

To survive summary judgment on her remaining hostile work environment claim under Title VII, Isberner must show that a reasonable jury could find that her workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.[87]  The Court determines the existence of such an environment by looking at the totality of the circumstances in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[88]  A hostile work environment claim may be established by showing either pervasiveness or severity—they "are independent and equal grounds" for such a claim.[89]  "Nevertheless, those two grounds 'are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of

---

[86] Walmart does not challenge whether Isberner exhausted her administrative remedies under Title VII.  To the extent these comments are probative of the hostile work environment claim lodged under Title VII, they are admissible.  *See Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1175 (10th Cir. 2020).

[87] *Tademy*, 614 F.3d at 1140 (citing *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007)).

[88] *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998) (quoting *Harris*, 510 U.S. at 23).

[89] *Tademy*, 614 F.3d at 1140 (citation omitted).

lesser harassment that extends over a long period of time also violates the statute.'"[90]   The Court evaluates these factors from both a subjective and an objective viewpoint,[91] considering not only the effect that the discriminatory conduct actually had on Isberner, but also the impact it would likely have had on a reasonable employee in Isberner's position.[92]

In requiring a showing of a workplace permeated by severe or pervasive discriminatory conduct, the Supreme Court struck a balance between two extremes, creating "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."[93]   In so doing, the Supreme Court excluded from actionable conduct that which is "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," because Title VII is not meant to be "general civility code."[94]   "'[S]imple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"[95]   On the other hand, conduct need not be so severe or pervasive that it seriously affects a plaintiff's psychological well-being.[96]   The determination of whether a hostile environment existed "is not, and by its nature cannot be, a mathematically precise test."[97]

Isberner alleges that the hostile work environment began in 2015, when Rohr started calling her the "crazy HR lady" in front of others; this occurred more than a dozen times.

---

[90] *Id.* (quoting *Cerros v. Steel Techs, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)).

[91] *Id.* (citing *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir. 1997)).

[92] *Harris*, 510 U.S. at 21−22.

[93] *Id.* at 21.

[94] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

[95] *Id.* (citations omitted).

[96] *Nieto v. Kapoor*, 268 F.3d 1208, 1219 (10th Cir. 2001) (citing *Harris*, 510 U.S. at 22).

[97] *Id.* at 1220 (quoting *Harris*, 510 U.S. at 22).

Standing alone, these comments were neither physically threatening nor particularly severe. Rather, they were merely offensive or in the nature of sporadic teasing, which is not indicative of a severe or pervasively hostile work environment.[98]  Isberner never reported these comments, and there is no evidence that they affected her work performance.  But the Court must view Rohr's comments in conjunction with the entire hostile work environment and assess the cumulative weight of these comments under the totality of the circumstances.

It is uncontroverted that Isberner and Rohr were frequently in conflict starting in 2018. Isberner testified that in 2018 and 2019, Rohr verbally attacked her on multiple occasions.  The first incident Isberner specifically recalled was in June 2018, when Rohr verbally attacked her at the Dodge City meeting in front of her coworkers.  In late 2018, Rohr confronted Isberner about his belief that she was spreading rumors about his alleged affair, and accused her of lying.  In February 2019, Rohr told Palmer that Isberner had lied when she claimed that he had agreed to travel to Liberal to witness her interviews of employees.  On March 11, 2019, the day before her resignation email, Rohr publicly rebuffed Isberner's request to speak privately and, in front of two other employees, angrily accused her of lying about her investigation into the rumored affair and about what happened with the Liberal investigation.  While Isberner could only specifically recall these incidents, she testified that these were the "toughest" instances of verbal abuse, and that Rohr "could just blow up," and was "very unpredictable."[99]  Isberner also testified that she felt physically threatened on two of these occasions, and that feeling unsafe was an ongoing problem.

---

[98] *See, e.g.*, *Morris v. City of Colorado Springs*, 666 F.3d 654, 666 (10th Cir. 2012) (stating that a pervasively hostile work environment requires a "steady barrage of opprobrious . . . comments" (citation omitted)); *Nettle v. Ctl. Okla. Am. Indian Health Council, Inc.*, 334 F. App'x 914, 923–24 (10th Cir. 2009) (finding comments were not severe or pervasive where they were not physically threatening or humiliating, and that "[w]here comments are made in jest and the plaintiff recognizes them as such, unless they are of unusual pervasiveness or severity, they cannot ordinarily be regarded as having 'alter[ed] the conditions of the victim's employment and create[d] an abusive working environment'" (citation omitted)).

[99] Isberner Dep., Doc. 51-1 at 191:10–17.

Rohr alternated his verbal assaults with completely ignoring Isberner's attempts to work with him.  In January 2019, Rohr refused to speak to Isberner at a meeting in Dallas, leaving the table as she approached.  When Isberner asked if Rohr had time to go over some things with her after a March 5 meeting, he told her he did not have time and left.  Rohr thereafter ignored her emails, phone calls, and text messages.  By the March 11 confrontation, Rohr informed Isberner that he would never speak with her alone again.

Isberner has come forward with evidence about the impact the discriminatory conduct had on her, as well as the impact it would likely have had on a reasonable employee in plaintiff's position.  She has proffered evidence that she felt physically threatened by Rohr's conduct, and that Palmer's unwillingness to acknowledge or investigate the breakdown in Isberner's relationship with Rohr created an unreasonable interference with her work performance.  When viewed in the light most favorable to Isberner, the evidence demonstrates that Isberner was required to work closely with Rohr in order to perform her job duties, including investigating claims of misconduct, and certainly, attending meetings about Market 406 business.  Given Rohr's unpredictable, explosive conduct, and his refusal to engage with her by the end of her tenure, a reasonable jury could conclude that a reasonable person in Isberner's position would have considered the work atmosphere so full of severe or pervasive intimidation, ridicule, and insult due to her gender that it altered the conditions of her employment.  As such, the Court finds that Plaintiff has created a genuine issue of material fact about whether Rohr's conduct created a sufficiently severe or pervasive hostile work environment.[100]

Walmart contends that the evidence shows all of these incidents arose out of work-related

---

[100] *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) ("The inquiry 'is particularly unsuited for summary judgment because it is quintessentially a question of fact.'" (citation omitted)).

disagreements, not Isberner's gender.  "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of . . . discrimination as a result of that environment."[101]  The Tenth Circuit has explained that "[t]he critical issue 'is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'"[102]  Isberner correctly points out that facially neutral abusive conduct can support a finding of animus sufficient to sustain a hostile work environment claim when such neutral conduct "is viewed in the context of other, overtly . . . discriminatory conduct."[103]

Viewing the totality of the circumstances and the evidence as a whole, including Rohr's past comments and a substantial amount of "me too" evidence, a reasonable jury could find that Rohr's abusive conduct supports Isberner's hostile work environment claim.[104]  At least five female employees reported that Rohr regularly yelled and screamed at them.  Isberner witnessed Rohr publicly ridicule or reprimand three female store managers; Rohr told Isberner he wanted certain female managers removed; Isberner witnessed Rohr yelling in Wehling's face; Sullivan testified that Rohr yelled in her face about twice a year; Rohr made comments about Sullivan's pregnancy and weight; and Isberner witnessed Rohr belittling Sullivan.  Although Sullivan testified that she also witnessed Rohr raise his voice toward male employees and was not sure whether he yelled at female employees more frequently, his other gender-based treatment toward

---

[101] *Deflon v. Danka Corp. Inc.*, 1 F. App'x 807, 815 (10th Cir. 2001) (quoting *Gross v. Burggraf Constr. Co*., 53 F.3d 1531, 1537 (10th Cir. 1995)).

[102] *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

[103] *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999) (citing *Bolden v. PRC, Inc*., 43 F.3d 545, 551 (10th Cir. 1994)).

[104] *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007) (characterizing defenses that other male employees were similarly criticized and that the alleged harassing comments were gender-neutral as "circumvent[ing] the proper 'totality of the circumstances' test by conveniently stripping facts of their context, which we have affirmed to be the touchstone of our analysis.").

her, coupled with no evidence of specific instances of similar behavior toward male employees, could persuade a reasonable jury that Rohr's behavior was based on Sullivan's gender.

Walmart's motion for summary judgment is denied on Isberner's hostile work environment claim under Title VII.

### C. Constructive Discharge Under Title VII, the ADA, and the ADEA

If a plaintiff demonstrates constructive discharge, that is "discharge in circumstances of discrimination so intolerable that a reasonable person would resign, we treat the employee's resignation as though the employer actually fired him."[105]  Isberner claims that she was constructively discharged as a result of the hostile work environment; therefore, her constructive discharge claim "can be regarded as an aggravated case of . . . hostile work environment."[106]  The conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant, as is the employer's subjective intent.[107]  Whether a plaintiff was constructively discharged is usually a question of fact,[108] but when "the record does not give rise to a reasonable inference that a constructive discharge has occurred, the question is appropriately resolved by a judge as a matter of law."[109]

### 1. Intolerable Working Conditions

As discussed above, Isberner has presented a triable case of hostile work environment under Title VII.  The Court further finds that the evidence is susceptible to more than one interpretation as to whether Isberner's working conditions became so intolerable that she had no

---

[105] *Green v. Brennan*, 578 U.S. 547, –, 136 S. Ct. 1769, 1779 (2016).

[106] *Pa. State Police v. Suders*, 542 U.S. 129, 146 (2004).

[107] *See Derr v. Gulf Oil Corp.*, 796 F.2d 340, 342–43 (10th Cir. 1986).

[108] *Strickland v. UPS*, 555 F.3d 1224, 1228 (10th Cir. 2009).

[109] *Heutzenroeder v. Mesa Cnty. Valley Sch. Dist. 51*, 391 F. App'x 688, 693 (10th Cir. 2010) (citing *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1222 (10th Cir. 2002)).

choice but to resign.  Rohr refused to meet with Isberner alone, with Palmer's approval, despite the need for them to make management decisions together.  It is undisputed that they were required to work closely together to lead the Market 406 team.  And Rohr failed to communicate with Isberner at all for a week prior to her resignation, not responding to her emails.  Given that Isberner reported to Palmer and that Isberner considered Rohr her defacto supervisor, or at least the person in charge of her assigned market, a reasonable jury could find that this affected Isberner's ability to fully perform and that Rohr's silence specifically affected her planning a training event in March 2019.  Additionally, Rohr's failure to appear as a third-party witness during the Liberal Investigation caused her to be reprimanded by Palmer during her 2019 performance evaluation, and she was removed from that investigation.  Moreover, Palmer stopped being as responsive to Isberner's calls and emails after Isberner reported Rohr's conduct in November 2018, and Palmer gave Isberner a lower performance evaluation than she had received in the past after that meeting.  Isberner believed her job was in jeopardy.

Walmart argues that Isberner "does not establish that she took steps short of resignation that a reasonable person would have taken to make her working conditions more tolerable."[110] Specifically, Walmart points to Isberner's failure to report Rohr's offensive comments in 2014–2016, and Isberner's statement to Palmer and Stokes during her Open Door meeting that she enjoyed a great relationship with Rohr until about 2018.  But this evidence is consistent with Plaintiff's contention that although Rohr's conduct was offensive in 2014–2016, it escalated in 2018 to hostile and aggressive behavior.  While the earlier comments signaled the beginning of the hostile work environment, Isberner cited increasingly intolerable working conditions beginning in about 2018.

---

[110] *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992).

It is true that Isberner never lodged a formal complaint about Rohr with Global Ethics, nor did she tell Palmer after November 2018 that Rohr's refusal to speak with her privately and his general non-responsiveness was making her job difficult.  Rather, in Palmer's view, Isberner abruptly resigned her employment hours after a confrontation with Rohr on March 11, 2019.  But viewing the evidence in the light most favorable to Isberner, she perceived reporting Rohr's conduct would be futile.  "There certainly may be situations where lodging a complaint with a supervisor would be perceived by a reasonable person to be a clearly futile act . . . ."[111]  Lodging a complaint may be perceived as futile "where the plaintiff's own previous complaints were ignored."[112]  Walmart's policy provided for complaints to be made through either Global Ethics, or to any manager under the Open Door policy.  Here, Isberner had a negative experience with Open Door policy, where one of her past complaints was ignored.

Isberner testified that she did not file a complaint of retaliation because she was "[t]oo fearful."  She claims that she has witnessed people getting "worked out" and suffer further retaliation for reporting such misconduct.[113]  As an MHRM, Isberner received over a dozen complaints of discrimination against Rohr during her tenure working with him.  She testified that although she attempted to intervene when Wehling made her complaint about Rohr, she "was basically ignored.  I helped draw up the final documents that may not have been fully accurate.  And I did so out of fear of consequences. . . .  I painted a picture more—I painted a picture closer to what Chad wanted than what I believed."[114]  Similarly, Sullivan never reported Rohr, and testified that she believed doing so would be futile.

---

[111] *Woodward*, 977 F.2d at 1402.

[112] *Lintz v. Am. Gen. Finance, Inc.*, 50 F. Supp. 2d 1074, 1085 (D. Kan. 1999) (citation omitted).

[113] Isberner Dep., Doc. 51-1 at 77:8–17.

[114] *Id.* at 52:20–53:1, 53:17–19.

Walmart received two anonymous reports that Rohr had engaged in gender discrimination in the summer of 2017 and apparently failed to even interview Rohr about those reports.  Most importantly, Isberner tried to report Rohr's conduct to Palmer in November 2018.  According to her testimony, she told Palmer during an emotional meeting, during which she was crying, that she did not believe that Rohr would have treated her the same way if she was a man.  And she told Palmer that Rohr did not like women in positions of power, using the examples of Sullivan and Owens.  Isberner testified that she felt Palmer was not listening to her and felt her job was in jeopardy after this meeting.  Rather than investigate, Palmer began ignoring Isberner's communications and condoned, without telling Isberner, Rohr's decision to stop speaking with Isberner privately.  A reasonable jury could conclude that Isberner reasonably perceived that further reports about Rohr would be futile.  After Rohr verbally attacked her on March 11, 2019, for the second time since her November 2018 meeting with Palmer, there is a genuine issue of material fact about whether Isberner felt she had no other choice but to resign.

## 2.      Causation

To demonstrate constructive discharge, Isberner must also demonstrate a genuine issue of material fact that the intolerable working conditions were because of her gender, age, or disability.[115]  Walmart argues that Isberner's cannot show that her alleged intolerable working conditions were related to her age, disability, or gender.  The Court agrees with Walmart that Isberner fails to come forward with evidence to support intolerable working conditions due to age- and disability-based animus.  As discussed earlier in this opinion, the only evidence suggesting age bias on behalf of Rohr are the two comments he made in 2014 or 2015 about being uncomfortable that Isberner was his mother's age.  Those comments, which were different than

---

[115] *See, e.g.*, *Klindt v. Honeywell Int'l, Inc.*, 303 F. Supp. 2d 1206, 1217 (D. Kan. 2004) (citation omitted).

Rohr's other references to Isberner's gender and disability, were made several years before the constructive discharge and there is nothing about the circumstances of Rohr or Palmer's treatment of Isberner in 2018 to suggest these comments were tied to that conduct, or that age-based animus was otherwise responsible for Rohr's abusive treatment.

Likewise, the only evidence in the record of disability-based animus are the comments by Rohr in 2014–2016 referencing Isberner's alcoholism, and Palmer's phone call to Isberner in 2018 asking when she would return from her FMLA leave.  Rohr's isolated comments years before her constructive discharge are not probative that Rohr's later conduct was based on disability, given the comments' infrequency, attenuation from her resignation, and difference in type of conduct by Rohr as compared to 2018 and 2019.  Therefore, the Court agrees that Isberner fails to proffer sufficient evidence to create a genuine issue of material fact about whether her constructive discharge occurred under circumstances giving rise to an inference of age and disability discrimination.

But viewing the evidence in the light most favorable to Isberner, as the Court must, a reasonable jury could determine that the constructive discharge occurred under circumstances giving rise to an inference of gender discrimination for the same reasons discussed in detail on the hostile work environment claim.  Walmart insists that the only explanation for Rohr's conduct was his belief that Isberner was spreading false rumors about him.  But the Court notes that, according to the record, some of Rohr's abusive conduct toward Isberner predated Rohr learning that Isberner told Livingston about reports of Rohr's rumored workplace relationship in late 2018. The market meeting in Dodge City where Rohr verbally attacked Isberner occurred on June 16, 2018.  And Rohr's failure to participate in Isberner's initiative programs and investigations occurred in 2017 and 2018.  A reasonable jury could conclude that if Rohr's hostility was

triggered only by his belief that Isberner was spreading rumors about him, this conduct would not have preceded him learning this information.

Walmart argues that Isberner did not view Rohr's treatment as discriminatory, pointing to her deposition testimony that she "clumped . . . together" her concerns relating to gender, disability, and age when expressing her frustrations about her job" to Palmer in November 2018.[116]  As already discussed, there is a genuine issue of material fact about the degree to which Isberner placed Palmer on notice that she was complaining of gender discrimination.  Isberner reported to Palmer that Rohr did not like women in positions of power, and she recalls talking about the disparate way that Rohr treated her and store managers Sullivan and Owens.  Also, Isberner told Palmer that she did not believe Rohr would be treating her the same way if she was a man.  Despite Plaintiff's testimony about clumping her complaints together, which she attributed to being very emotional during the meeting, a reasonable jury could infer that she was constructively discharged under circumstances that give rise to an inference of gender discrimination.

The Court therefore grants Walmart's summary judgment motion on Isberner's constructive discharge claims alleged under the ADA and ADEA.  The Court denies Walmart's summary judgment motion on the Title VII constructive discharge claim.

### D.    *Faragher-Ellerth* Defense

When considering a motion for summary judgment on a hostile work environment claim, including a compound claim for constructive discharge, the Court must determine whether the employer is liable under Title VII for the conduct of its employees in creating the hostile work

---

[116] Isberner Dep., Doc. 51-1 at 242:1−12.

environment.[117]  An employer can only be vicariously liable for an "actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."[118]  In cases where no tangible adverse employment action has been taken against the plaintiff, the defendant employer may raise the affirmative defense articulated in *Faragher v. City of Boca Raton*[119] and *Burlington Industries, Inc. v. Ellerth*,[120] which Walmart does here. Alternatively, when a co-worker harasses the plaintiff, "an employer is directly liable . . . if the employer was negligent with respect to the offensive behavior."[121]

### 1.   Supervisory Authority

The Supreme Court has explained that under this framework, a "supervisor" has "authority to make tangible employment decisions," which "can usually be readily determined, generally by written documentation."[122]  An employer has empowered an employee to take "tangible employment actions against the victim" if the employee can effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[123]  Supervisory status can also be based on "the power to *recommend* or otherwise substantially influence tangible employment actions, and . . . can thus indirectly effectuate them."[124]  Without question, Palmer

---

[117] *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1139 (10th Cir. 2008) (citing *Adler v. Walmart Stores*, 144 F.3d 664, 673–76 (10th Cir. 1998)); *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004).

[118] *Faragher v. City of Boca Raton*, 524 U.S. 775, 777 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 745 (1998).

[119] 524 U.S. 775 (1998).

[120] 524 U.S. 742 (1998).

[121] *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013).

[122] *Id.* at 431–32.

[123] *Id.* at 431.

[124] *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 747 (10th Cir. 2014) (citing *Vance*, 570 U.S. at 447).

had supervisory authority over Isberner under this definition.  While it is undisputed that Rohr could not fire or demote Isberner, there is a genuine issue of material fact about whether Rohr had the power to substantially influence tangible employment actions against Isberner.  According to Isberner, Rohr had the power to discipline her and weigh in on tangible employment actions concerning her job.  And it is undisputed that Rohr contributed to Isberner's performance evaluation in 2017, and that her performance evaluations impacted her pay.  Therefore, the Court considers Walmart's liability under a respondeat superior theory of liability, rather than negligence.

### 2.     Tangible Employment Action

Isberner argues that the *Faragher-Ellerth* affirmative defense does not apply here because the hostile work environment culminated in a tangible employment action—her constructive discharge.  But the Supreme Court has concluded that constructive discharge, unlike an actual termination, is not automatically considered a tangible employment action for purposes of determining the employer's liability.[125]  "[W]hen an official act does not underlie the constructive discharge, the *Ellerth* and *Faragher* analysis . . . calls for extension of the affirmative defense to the employer."[126]  An official act refers to the "'means by which the supervisor brings the official power of the enterprise to bear on subordinates.'  Often, the supervisor will 'use [the company's] internal processes' and thereby 'obtain the imprimatur of the enterprise.'"[127]  For example, when an official act is reflected in the company's records, it "shows 'beyond question' that the supervisor has used his managerial or controlling position to the employee's disadvantage.'"[128]

---

[125] *Penn. State Police v. Suders*, 542 U.S. 129, 147–48 (2004).

[126] *Id.* at 148.

[127] *Id.* at 144 (quoting *Ellerth*, 524 U.S. at 762).

[128] *Id.* at 148 (quoting *Ellerth*, 524 U.S. at 760).

The Court has determined there is a fact issue about whether Rohr had the power to recommend or otherwise substantially influence tangible employment actions involving Isberner. But, viewing the evidence in the light most favorable to Isberner, even assuming Rohr had supervisory authority, his alleged misconduct did not involve "official directions and declarations" that demonstrate he was aided by the agency relation.  Isberner alleges Rohr's misconduct included offensive comments, hostile and abusive behavior, failure to cooperate and meet with Isberner, and failure participate in certain initiative programs.  These were unofficial acts of misconduct.[129]  Thus, Walmart must be afforded a "chance to establish, through the *Ellerth/Faragher* affirmative defense, that it should not be held vicariously liable."[130]

### 3.    Elements of *Faragher-Ellerth* Defense

Where a supervisor is accused of sexual harassment and no tangible employment action is taken, the employer can defeat vicarious liability by establishing two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise."[131]  The employer has the burden of proving both prongs of this defense by a preponderance of the evidence.[132]  Thus, the employer "must prove both that it *acted* reasonably in preventing and correcting

---

[129] *See id.* at 150 (first citing *Reed v. MBNA Mktg. Sys., Inc.*, 333 F.3d 27 (1st Cir. 2003); then citing *Robinson v. Sappington*, 351 F.3d 317 (7th Cir. 2003)) (providing examples of decisions with correct "official act" analysis—in *Reed*, the supervisor was found not to have used official action where the misconduct was repeated sexual comments and a sexual assault, and, in *Robinson*, where the court found there was official action where a court employee's presiding judge transferred her to another judge after she complained of sexual harassment by her original judge, and warned that her first six months with the new judge "probably would be hell" and that it was in her "best interest to resign").

[130] *Id.* at 149.

[131] *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009) (quoting *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1261 (10th Cir. 1998)).

[132] *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 746 (10th Cir. 2014) (citing *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1228 (10th Cir. 2000)).

harassment and that the victimized employee unreasonably *failed to act* by not utilizing complaint opportunities.  The employer will lose this defense if it fails either prong."[133]

"The first element [of the *Faragher-Ellerth* defense] incorporates both preventive and corrective requirements."[134]   "As for prevention, an employer 'acts reasonably as a matter of law to prevent harassment if it adopted valid [anti-]harassment policies and distributed those policies to employees via employee handbooks, even if it either provided no [anti-]harassment training or provided training only to managers.'"[135]   The preventive requirement of the first *Faragher-Ellerth* element is met here by Walmart's adoption of its Anti-Discrimination Policy, which provides multiple avenues for an employee to report discriminatory, harassing, or retaliatory behavior, and with which Isberner was intimately familiar in her role as an MHRM.

"As for the correction requirement [of the defense's first element], an employer must 'show that it acted reasonably promptly . . . *when it was given proper notice of [the employee's] allegations* as required under its complaint procedures.'"[136]   And under the second element of the defense, the employer must show "that the victimized employee unreasonably delayed in reporting [or never reported] incidents of [prohibited] harassment."[137]

Walmart argues that because Isberner neither reported Rohr to Global Ethics, nor specifically reported Rohr's behavior as discriminatory to Palmer, it was not given proper notice of her allegations.  It is undisputed that Isberner did not report Rohr to Global Ethics, but Isberner claims to have had a negative experience with Global Ethics in the past.  And she was aware of

---

[133] *Id.* (quoting *Clark v. United Parcel Serv.*, 400 F.3d 341, 349 (6th Cir. 2005)).

[134] *Stapp v. Curry Cnty. Bd. of Commr's*, 672 F. App'x 672, 841, 849 (10th Cir. 2016) (citing *Debord*, 737 F.3d at 653).

[135] *Id.* (alterations in original) (quoting *Debord*, 737 F.3d at 653).

[136] *Id.* (second alteration in original) (quoting *Helm v. Kansas*, 656 F.3d 1277, 1289 (10th Cir. 2011)).

[137] *Id.* at 849−50 (alterations in original) (quoting *Helm*, 656 F.3d at 1291).

many formal and informal complaints against Rohr that had gone nowhere. The Anti-Discrimination Policy alternatively allowed her to report to a salaried member of management, such as Palmer. While it is undisputed that from 2014 to 2018, Isberner did not report Rohr's conduct to Palmer or anyone, she did meet with Palmer in person in November 2018, at which time she specifically discussed Rohr's conduct. Although Isberner acknowledges that in this conversation she was "vague" about her concerns, she recalled telling Palmer that Rohr did not like women in positions of power, how Rohr treated Isberner and two other female store managers, and that Rohr was hostile and aggressive toward her and treated her in ways that he would not treat a man. Palmer made no attempt to investigate Isberner's claims after this conversation and, in fact, became less responsive when Isberner attempted to contact her.

Walmart contends that Isberner's complaints were too vague to constitute proper notice of her allegations, but the Court finds that this is a question properly left to the jury, as it depends on a credibility determination between Isberner's and Palmer's accounts of that conversation. Viewed in the light most favorable to Isberner, she placed Palmer on notice of her claims; thus, Walmart fails to demonstrate by a preponderance of the evidence that Isberner unreasonably delayed or never reported these instances of harassment. Walmart's motion for summary judgment on its affirmative defense is denied.

### E.    Discrimination Under Title VII, the ADA, and the ADEA

Isberner asserts that Walmart otherwise discriminated against her under Title VII, the ADA, and the ADEA based on (1) Rohr's refusal to communicate with Isberner during her last weeks of employment (with Palmer's knowledge and approval); (2) Rohr's refusal to participate in Isberner's initiative programs after August 2018; (3) Isberner's ranking as Palmer's lowest

"Solid Performer" with a recommended raise of 1.5% in February 2019; and (4) Isberner's removal from the Liberal Investigation.

Under each statute, the plaintiff bears the ultimate burden of proving her employer intentionally discriminated against her, but may do so "through either direct evidence or circumstantial evidence that creates an inference of intentional discrimination."[138]  Where, as here, the plaintiff "seeks to use circumstantial evidence to show [her] employer's discriminatory intent, [the court] employ[s] the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*."[139]  Under that analysis:

> A plaintiff carries the burden of raising a genuine issue of material fact on each element of his prima facie case.  If plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision.  If defendant articulates a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether the defendant's reason for the adverse employment action is pretextual.[140]

The plaintiff's burden of establishing a prima facie case is "not onerous."[141]

The prima facie case under all three statutes are similar.  To set forth a prima facie case of discrimination under Title VII, a plaintiff must establish (1) membership in protected class; (2) an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.[142]  To establish a prima facie case of disability

---

[138] *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (citations omitted).

[139] *Id.* (citing *Adamson*, 514 F.3d at 1145); *see Butler City of Prairie Village*, 172 F.3d 736, 747 (10th Cir. 1999) (citations omitted).

[140] *Kilcrease v. Domenico Transp., Co.*, 828 F.3d 1214, 1220 (10th Cir. 2016) (quoting *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003)) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)).

[141] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Tabor v. Hilti, Inc.*, 793 F.3d 1206, 1216 (10th Cir. 2013).

[142] *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context); *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266

discrimination under the ADA, a plaintiff must show that she "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability."[143]  "In order to demonstrate 'discrimination,' a plaintiff generally must show that [she] has suffered an 'adverse employment action' because of the disability."[144]  Finally, under the ADEA, a prima face case requires the plaintiff to show that: "1) she is a member of the class protected by the [ADEA]; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) she was treated less favorably than others not in the protected class."[145]  Thus, under each statute, a prima facie case of discrimination requires an adverse employment action that occurs under circumstances giving rise to an inference of discrimination.  Walmart moves for summary judgment on both of these elements under all three statutes.

Although the Tenth Circuit takes a broad view of what constitutes an adverse employment action, "mere inconvenience or an alteration of job responsibilities" does not qualify.[146]  An adverse employment action with respect to a discrimination claim "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[147]

---

(10th Cir. 2015) (acknowledging that the Tenth Circuit has used different versions of the prima facie test, but stating that it has "express[ed] a preference for more concise formulations." (citations omitted)).

[143] *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037−38 (10th Cir. 2011) (quoting *Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1086 (10th Cir. 2008)).

[144] *Id.* at 1038 (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)) (collecting cases).

[145] *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1279 (10th Cir. 2010) (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998)).

[146] *Sanchez*, 164 F.3d at 532 (citations omitted).

[147] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (collecting cases).

Isberner argues that, in addition to constructive discharge, the following constitute adverse employment actions: (1) Rohr's refusal to communicate with Isberner during her last weeks of employment (with Palmer's knowledge and approval), which made it impossible for her to do her job; (2) Rohr's refusal to participate in Isberner's initiative programs; (3) Isberner's ranking as Palmer's lowest "Solid Performer" and a recommended raise of 1.5% in February 2019; and (4) Isberner's removal from the Liberal Investigation.[148]  Walmart argues that none of these adverse employment actions alleged by Isberner constitutes a significant change in employment status.

As already discussed, Isberner has come forward with evidence demonstrating a genuine issue of material fact about whether she was constructively discharged.  However, the Court agrees with Walmart that Isberner has not come forward with sufficient evidence to create a genuine issue of material fact about whether Walmart's other alleged adverse employment actions are actionable as independent discrimination claims.

### 1.     Rohr's Refusal to Speak to Isberner and Participate in Initiative Programs

The evidence does not demonstrate that Isberner suffered a significant change in her employment status as a result of Rohr's refusal to speak with her privately or participate in certain initiatives programs, only one of which was actually Isberner's own initiative.  Isberner was never disciplined during her entire time at Walmart for failure to meet performance metrics or for any other reason.  To the extent Rohr's failures to engage with Isberner created a hostile work environment and/or intolerable working conditions that led to her resignation, such evidence

---

[148] In the Pretrial Order, Isberner also alleges theories of relief under each statute on the basis that Walmart "failed to investigate her discrimination claims."  Doc. 43 at 12–13.  But in her response to the summary judgment motion, Isberner does not assert "failure to investigate" as a discrete adverse action to which she was subjected. Indeed, she does not come forward with evidence that Walmart's failure to investigate constituted a significant change in her employment.  Instead, Isberner presents evidence of Walmart's failure to investigate her November 2018 complaints to Palmer in support of her hostile work environment and constructive discharge claims.  The Court has addressed them in that context.

should be considered in the context of those claims, but it is not a separate adverse employment action.

### 2.    Performance Evaluation

While Isberner contends that her "undeservedly low" performance review in 2019 and resulting lower recommended raise constitutes an adverse employment action, her rating that year was the same as she had received from 2012 to 2017—the only year in which Isberner received an "Exceeds Expectations" rating was the year in which Rohr was asked to weigh in on her performance.  Further, the Tenth Circuit has held that when a plaintiff receives a lower performance review compared to previous reviews, but remains in the satisfactory range and fails to show how the lower rating amounts to a negative evaluation, there has been no adverse employment action.[149]  Here, Isberner testified that her 2019 "Solid Performer" ranking was expected and not at all negative, and she offers no evidence that this review resulted in her being demoted, her wages being cut, or a *substantial* change in her job responsibilities, as set forth below.  Isberner also admits that at least one of the criticisms of her performance in 2018–2019, her failure to make enough in-person visits to stores, was valid.  While this less positive evaluation compared to past years may be relevant evidence in support of Isberner's hostile work environment claim, it is not a separately actionable adverse employment action.[150]

### 3.    Removal from Liberal Investigation

Isberner has not shown that her removal from the Liberal Investigation—of which she was informed during her 2019 performance review—amounted to more than a minor alteration of job

---

[149] *See Sotunde v. Safeway*, 716 F. App'x 758, 768 (10th Cir. 2017); *Fox v. Nicholson*, 304 F. App'x 728, 733 (10th Cir. 2008); *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994).

[150] *See Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 747 (10th Cir. 2014) (explaining that an "unflattering performance evaluation . . . may have contributed to the hostile work environment, and it may be relevant to [the plaintiff's] reasonableness in not reporting [the supervisor]," but it was not a tangible employment action (quoting *Ellerth*, 524 U.S. at 754)).

responsibilities.  The Liberal Investigation was one of many investigations Isberner conducted

and the only one from which she was ever removed, and the record does not reflect that her

removal resulted in a lack of meaningful work, a title change, demotion, denial of a promotion,

change in compensation, or discipline.[151]

In sum, while the discrete adverse employment actions alleged by Isberner may be part of

a cumulative hostile work environment culminating in her constructive discharge, which she is

entitled to present to a jury, summary judgment is granted in favor of Walmart to the extent these

adverse employment actions are alleged as independent discrimination claims.

## F.    Retaliation

Isberner brings a claim for retaliation under Title VII only. Title VII prohibits an employer

from retaliating against an employee "because [s]he has opposed any practice made an unlawful

employment practice by this subchapter."[152]  Courts assess retaliation claims under the

*McDonnell Douglas* burden-shifting framework discussed above.[153]  To establish a prima facie

case of retaliation, the plaintiff must demonstrate that: (1) she engaged in protected opposition to

discrimination; (2) a reasonable person would have found the challenged action materially

adverse; and (3) there is a causal connection between the protected activity and the materially

adverse action.[154]

---

[151] *See, e.g.*, *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 934 (10th Cir. July 23, 2001) (finding that professor's removal from student's dissertation committee was not adverse employment action); *Young v. White*, 200 F. Supp. 2d 1259, 1274 (D. Kan. 2002) ("[T]he Circuit has held that an alteration of job responsibilities does not constitute an adverse employment action." (citations omitted)).

[152] 42 U.S.C. § 2000e-3(a).

[153] *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011) (citations omitted).

[154] *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008) (citing *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)).

### 1.   Prima Facie Case

Walmart challenges only the second element of Isberner's prima facie case, reiterating the arguments it makes to show that Isberner suffered no adverse employment action on her discrimination claims.  A retaliation claim requires an action that is "materially adverse" such that it could well "dissuade[] a reasonable worker from making or supporting a charge of discrimination."[155]  "While the employer's conduct need not affect the terms and conditions of employment," the injury must "ris[e] to a 'level of seriousness.'"[156]  "Acts that carry 'a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects' may be considered adverse actions, although '"a mere inconvenience or an alteration of job responsibilities" will not suffice.'"[157]  When determining whether a plaintiff has suffered a materially adverse action that would dissuade her from reporting discrimination, the court "focuses on the employer's retaliatory action, not the underlying discrimination the employee had opposed."[158]  This is a less stringent standard than applies when determining whether a plaintiff has suffered a materially adverse action sufficient to support a discrimination claim.[159]  "[W]hile the standard is sensitive to the particular circumstances of each case, it prescribes an objective

---

[155] *Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 64 (2006)).

[156] *Daniels*, 701 F.3d at 638 (first quoting *White*, 548 U.S. at 64; and then quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007)).

[157] *Reinhardt*, 595 F.3d at 1133 (quotation marks omitted) (quoting *Annett v. Univ. of Kan.*, 372 F.3d 1233, 1239 (10th Cir. 2004)).

[158] *Semsroth*, 555 F.3d at 1184 (citing *White*, 548 U.S. at 69–70).

[159] *See White*, 548 U.S. at 67 ("[W]e conclude that Title VII's substantive provision and its antiretaliation provision are not coterminous. The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm. We therefore reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actionable retaliation to so-called 'ultimate employment decisions.'").

inquiry that does not turn on a plaintiff's personal feelings about those circumstances."[160]  The plaintiff is required to show "objective evidence of material disadvantage."[161]

Isberner concedes that she "does not predicate her retaliation claims on Rohr's actions," as it is undisputed that Rohr was never informed about Isberner's complaint to Palmer in November 2018—her alleged protected opposition.[162]  Instead, she alleges retaliation based on her constructive discharge and the following actions by Palmer: (1) her 2019 performance review that resulted in a lower recommended raise for Isberner than certain peers; (2) permitting Rohr not to speak with Isberner alone; and (3) removing Isberner from the Liberal Investigation.[163]

### a.   Performance Evaluation

There is no genuine issue of material fact that a reasonable person would not consider Isberner's satisfactory performance evaluation of "Solid Performer" materially adverse.[164]  Isberner testified that this rating was neither negative nor unexpected, and it was the same rating she received for the five years preceding her "Exceeds Expectations" rating in 2018.  Moreover, although Isberner was ranked at the bottom of the "Solid Performer" category and received a lower recommended raise than her peers, she acknowledges that at least one of the criticisms she received during her 2019 evaluation was well-founded.  The record does not support that

---

[160] *Semsroth*, 555 F.3d at 1184  (citing *White*, 548 U.S. at 68); *see Daniels*, 701 F.3d at 638.

[161] *Id.* at 1185.

[162] Doc. 49 at 73.

[163] Isberner concedes that her lack of involvement in the 2018 WIL Conference cannot serve as a materially adverse action for the purposes of her retaliation claim because it occurred before the date on which she contends she reported Rohr's conduct to Palmer in November 2018.

[164] *See, e.g.*, *Winston v. Ross*, 725 F. App'x 659, 666 (10th Cir. 2018) (finding that "generally positive" performance review was not materially adverse to support retaliation claims); *Stover v. Martinez*, 382 F.3d 1064, 1075 (10th Cir. 2004) ("[W]e have previously recognized that simply because an employee receives an evaluation lower than previous evaluations, the lower evaluation cannot be assumed to be a negative evaluation for the purposes of a retaliation claim." (citing *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994))); *Meredith*, 18 F.3d at 896 (finding that plaintiff failed to raise inference that a "meets expectations" rating amounted to a negative evaluation).

Isberner's satisfactory performance rating (or her corresponding recommended raise) was either unjustified or in the nature of a disciplinary write-up.   Isberner has not demonstrated that the satisfactory performance evaluation caused her a risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects.

### b.       Permitting Rohr Not to Speak with Isberner Alone

There is a genuine issue of material fact about whether Palmer's decision to allow Rohr not to speak with Isberner alone was materially adverse.  The Tenth Circuit counsels that whether decreased communications interfered with the plaintiff's job performance is "probative of whether the decrease was serious enough to dissuade a reasonable worker from filing or pursuing a discrimination claim."[165]  "The fact that [the plaintiff] continued to perform her duties satisfactorily is evidence that . . . [the] decreased communications were not materially adverse."[166]

Viewing the evidence in the light most favorable to Isberner, Rohr's refusal to meet with Isberner outside the presence of others prevented her from doing her job.  In early 2019, Palmer met with Rohr.  When he told her that he was uncomfortable speaking with Isberner alone, Palmer told him that while he should work out his problems with Isberner, he did not have to speak to her alone if it made him uncomfortable.  Palmer did not ask why Rohr was uncomfortable meeting alone with Isberner, nor did she conduct any further investigation, despite having received Isberner's November complaint about Rohr by this time.  A reasonable jury could conclude that Palmer emboldened Rohr to not only refuse to speak to Isberner privately, but to refuse to speak to her at all.  After Rohr received Palmer's blessing to stop meeting with Isberner alone, Rohr refused to speak with Isberner at a meeting in Dallas.  Then, on March 5, at the

---

[165] *Daniels v. United Parcel Serv.*, 701 F.3d 620, 639−40 (10th Cir. 2012).

[166] *Id.*

Case 2:20-cv-02001-JAR   Document 61   Filed 09/21/21   Page 55 of 60

conclusion of a meeting in Wichita, Isberner asked Rohr if he had time to "go over some things."[167]  Rohr responded that he did not have time and left.  Rohr ignored her emails, calls, and text messages after the March 5 meeting, and Isberner testified that her inability to communicate with Rohr in the week following the Wichita meeting resulted in her being unable to finalize plans for an upcoming training.  In sum, Isberner has come forward with evidence demonstrating that Palmer's decision to allow Rohr not to speak with Isberner alone caused Isberner to suffer an objectively material disadvantage in the workplace.

### c.      Removal from Liberal Investigation

Finally, as to Isberner's removal from the Liberal Investigation, "job duty assignments . . . are neither actionable nor categorically non-actionable."[168]  "We take a case-by-case approach, asking whether the record contains objective evidence of material disadvantage or merely the bald personal preferences of the plaintiff."[169]  The summary judgment record includes evidence that Isberner was reprimanded during her performance evaluation based on her handling of the Liberal Investigation.  And a key part of her job duties involved investigating complaints of misconduct.  Palmer and Carmen informed Isberner that she was removed from the investigation during her performance evaluation.  They delivered the news in a stern tone and as a reprimand.  And Rohr testified that this was the first time he was aware of someone being removed from an investigation  A reasonable jury could find that removing Isberner from the Liberal Investigation would dissuade a reasonable person in Isberner's position from making a charge of discrimination.

---

[167] Isberner Dep., Doc. 51-1 at 265:16−266:1.

[168] *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184−85 (10th Cir. 2009) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 71 (2006)).

[169] *Id.* at 1185 (citing *McGowan*, 472 F.3d at 742−43).

Walmart moves for summary judgment on the remaining steps of *McDonnell Douglas* as to Isberner's removal from the Liberal Investigation only.  Thus, Walmart's motion for summary judgment on Isberner's retaliation claim is granted on her performance evaluation theory of relief. The motion is denied on her theory that she was retaliated against when Palmer permitted Rohr not to speak with Isberner alone.

### 2.    Legitimate Non-Retaliatory Reason for Isberner's Removal from Liberal Investigation and Pretext

Walmart contends that it had legitimate non-retaliatory reasons for removing Isberner from the Liberal Investigation: (1) Palmer believed that Isberner failed to conduct the initial portions of the investigation in accordance with Walmart's policy requiring her to speak with associates with a third-party witness present; (2) Palmer believed Isberner misrepresented and attempted to cover up her lack of preparation for the investigation; and (3) Palmer was concerned at the time about Isberner's health and believed she was giving her a chance to rest and recover. Walmart thus fulfils its burden of articulating a legitimate, nonretaliatory reason for Isberner's removal from the Liberal Investigation and Isberner must come forward with evidence demonstrating that Walmart's stated reasons are a pretext for retaliation.

Pretext may be shown by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[170] Pretext can also be demonstrated by "direct evidence that the proffered rationale is false, or that the plaintiff was treated differently from similarly-situated employees."[171]  "The critical question

---

[170] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006).

[171] *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011) (citing *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)).

regarding this aspect of the *McDonnell Douglas* rubric is whether 'a reasonable factfinder could rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted [non-retaliatory] reasons.'"[172]  The Court examines "the facts as they appear *to the person making the decision*."[173]

Isberner has come forward with evidence demonstrating a genuine issue of material fact about whether Walmart's stated reasons for removing her from the Liberal Investigation are worthy of credence.  Walmart admits that Palmer's decision was based on a credibility assessment—she believed Rohr when he told her that he had not been asked to serve as a third-party witness for the investigation, and that he did not understand why Isberner believed he had.  Isberner told Palmer that she asked Rohr, and he agreed, to serve as the third-party witness in Liberal, that he failed to show up, and that he told her over the phone he was not coming.  The Court does not weigh credibility on summary judgment.  A reasonable jury could believe Isberner and not Rohr about whether he agreed to serve as a third-party witness.  And a reasonable jury could conclude that Palmer's decision to disregard Isberner's version of events and remove her from the investigation was pretextual.

A reasonable jury could also believe that Palmer's asserted health concerns are unworthy of credence.  Palmer informed Isberner that she was being removed from the Liberal Investigation during her 2019 performance evaluation, after Palmer and Carmen criticized the way she handled that investigation.  One of the main criticisms during this performance evaluation was that Isberner failed to secure a third-party witness, a conclusion that could only be reached if they

---

[172] *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (alterations in original) (quoting *Crowe*, 649 F.3d at 1196).

[173] *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (en banc) (quoting *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001)).

believed Rohr instead of Isberner's report of what happened.  It is undisputed that the performance evaluation occurred around the time Isberner contracted pneumonia; however, according to Isberner's testimony, her removal from the Liberal Investigation was delivered by Palmer and Carmen in a hostile tone.  Isberner testified that she had "never walked out of a performance appraisal in my 34 years of working and felt so beat up.  I mean, I was waiting for Heidi to say, you're fired."[174]  A reasonable jury could conclude from this evidence that Palmer did not remove Isberner from the Liberal Investigation based on concerns about her health.

Therefore, the Court finds that genuine issues of material fact preclude summary judgment on Isberner's retaliation claim, with the exception of her claim that her 2019 performance evaluation constituted unlawful retaliation.  Summary judgment is granted on that theory of retaliation.

## IV.     Conclusion

Isberner's theories of relief in this matter are highly interrelated.  For that reason, she urges that her claims under all three statutes—the ADA, ADEA, and Title VII—cannot be separated and should be construed together and allowed to proceed to trial.  As described above, the Court has taken care to construe the facts of this case in the light most favorable to Isberner, and, where appropriate, consider cumulative evidence of discriminatory conduct.  In sum, the Court finds that this case should proceed to trial on Isberner's claims that Walmart violated Title VII by discriminating and retaliating against her on the basis of her gender.  Specifically, her surviving claims allege gender-based retaliation and a hostile work environment that culminated in her constructive discharge.  Isberner has presented genuine issues of material fact as to these surviving claims, and Walmart's arguments in favor of summary judgment largely call for

---

[174] Isberner Dep., Doc. 51-1 at 86:1–5.

credibility assessments or for the Court to view the facts in the light most favorable to Walmart, rather than Isberner, the nonmoving party.  Instead, the Court follows the well-established standards that govern summary judgment motions.  Under these standards, a trier of fact must decide these issues.  The Court grants summary judgment to Walmart on the claims of disability and age discrimination, hostile work environment, and constructive discharge.  The Court also grants summary judgment on many of Isberner's claims of discrimination and retaliation to the extent she alleges they are independent from the hostile work environment and constructive discharge.   While Isberner cannot assert these dismissed claims of discrimination and retaliation as independent grounds for relief, the facts and circumstances surrounding the dismissed Title VII claims are admissible to demonstrate the surviving claims of hostile work environment, constructive discharge, and retaliation.

**IT IS THEREFORE ORDERED BY THE COURT** that Walmart's Motion for Summary Judgment (Doc. 44) is **granted in part and denied in part**.  Summary judgment is **granted** on Counts II and III (Violations of the ADEA and ADA) in their entirety, the discrimination claims alleged in Counts I (violations of Title VII) that are not premised on constructive discharge, and the retaliation claim in Count IV premised on Isberner's performance evaluation.  Summary judgment is **denied** on the hostile work environment and constructive discharge claims in Count I, and all theories of retaliation in Count IV except for Isberner's performance evaluation.  The Court will set a telephonic pretrial conference forthwith to discuss the trial date and pretrial deadlines.

**IT IS SO ORDERED.**

Dated: September 21, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE